**NOT FOR PUBLICATION**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

- - - - - - - - - - - - - - - - - - - - - - - - - -X
In re:

SEA OAKS COUNTRY CLUB, LLC,

                Debtor.
- - - - - - - - - - - - - - - - - - - - - - - - -X
In re:

SEA OAKS GOLF CLUB, LLC,

                Debtor.
- - - - - - - - - - - - - - - - - - - - - - - - -X

Chapter 11

Case No. 20-17229 (CMG)

Chapter 11

Case No.  20-17228 (CMG)

**OPINION**

**APPEARANCES:**

**Timothy P. Neumann, Esq.**
**Broege, Neumann, Fischer & Shaver**
Attorney for Debtor

**Robert N Braverman, Esq.**
**McDowell Law, PC**
Attorneys for Certain Lifetime Members

**Sommer L. Ross, Esq.**
**Duane Morris LLP**
Attorneys for Atlantic Homes, Inc.

**CHRISTINE M. GRAVELLE, U.S.B.J.**

**Introduction**

        Debtors, Sea Oaks Country Club, LLC ("Country Club") and Sea Oaks Golf Club, LLC

("Golf Club") (collectively, "Debtors") move before the Court for an order:  (I) approving the sale

of Debtors' assets free and clear of liens, claims and encumbrances; (II) authorizing the assumption

and assignment of certain executory agreements and leases; and (III) rejecting other executory

agreements and leases and all membership agreements (the "Motion").

As is apparent by Debtors' names, they own and operate a golf course, which is located at

99 Golfview Drive, Little Egg Harbor, New Jersey (the "Real Property").  Golf Club owns the

Real Property, which is improved by an 18-hole golf course, a clubhouse, halfway house, banquet

hall, inn and business office.  Golf Club also owns a motor vehicle, golf-related equipment,

computer equipment, and certain furniture, fixtures, and other personal property located on the

Real Property (the "Golf Club Assets").  Country Club owns a plenary consumption retail liquor

license, golf-related inventory, account receivables, and a modest amount of food, beverage and

liquor inventory (the "Country Club Assets") (collectively with Golf Club Assets, the "Sale

Assets").  Country Club operates the golf course, restaurant, inn and dining and catering facility.

Golf Club's source of revenue is through rents paid by Country Club to utilize the Golf Club

Assets.  The Debtors seek to sell both the Golf Club Assets and the Country Club Assets together

under the theory that such a sale would realize a higher price than attempting to separately sell

those assets.

The proposed purchaser of the Sale Assets is Atlantic Homes, Inc. ("Atlantic Homes").

Atlantic Homes is the 49% owner of both Country Club and Golf Club.  It also holds a note and

first mortgage as to the Real Property, which obligation is guaranteed by Country Club.  Atlantic

Homes' claim against Debtors exceeds $10,000,000.00.  The purchase price for the Sale Assets is

$3,000,000.00, well below the amount claimed.  The proposed payment for the transaction

contemplates a cash payment in the amount of $200,000.00 to be paid to Country Club for the

Country Club Assets, and a credit in the amount of $2,800,000.00 against the amount owed to Atlantic Homes under its note.

Objecting to the motion are certain parties who paid a lump sum to enter into lifetime golf memberships (the "Lifetime Members"[1] and the "Lifetime Memberships") with a predecessor of the Debtors, Sea Oaks Country Club, L.L.P. (the "L.L.P.").  They enjoy benefits including no greens fees for life, preferential tee times, and discounts on merchandise.  Certain Lifetime Memberships are transferrable,[2] and state that their rights and privileges shall be irrevocable and continue in perpetuity.

The Lifetime Members object to any sale of assets which seeks to reject the Lifetime Memberships.  The objection is premised upon three main points:  (i) as the Lifetime Members have fully performed their obligations with regards to the Lifetime Memberships, and because the Lifetime Memberships are irrevocable, they are not executory contracts and may not be rejected under 11 U.S.C. § 365(a); (ii) to the extent the Lifetime Memberships constitute an interest in the property being sold, Debtors are unable to satisfy any of the requirements of 11 U.S.C. § 363(f); and (iii) the sale cannot satisfy the "good faith" or "business purpose" requirements for a § 363 sale under In re Abbotts Dairies of Pa., Inc. because Atlantic Homes is an insider of the Debtors which had knowledge of the Lifetime Memberships and the sale provides the estate with an amount insufficient for any significant distributions to creditors.  See In re Abbotts Dairies of Pa., Inc., 788 F.2d 143, 150 (3d Cir. 1986).

---

[1] The objecting Lifetime Members are:  David Johnson, Michael Cocozza, William Bode, Betty Chesner, Robert Connors, William Davidson, Thomas Dickson, William Felix, Ralph Moscato, Richard Pollard, Daniel Rauh, William Stanbach, Peter Swarts, Julie Swarts, Richard Toledo, Edward Zebrowski, and Edward Zolcinski.  These members have retained common counsel to represent their interests.  An additional Lifetime Member, Carl Sanderson, did not retain counsel but appeared at oral argument and submitted opposition via e-mail after the hearing.
[2] A document provided by the Lifetime Members indicates that there were three options to obtain a Lifetime Membership, two of which were not transferrable.

Debtors have responded to the Lifetime Members' objections, positing:  (i) the Lifetime Memberships executory contracts subject to rejection under § 365 because the Lifetime Members have continuing obligations; (ii) the Third Circuit's expansive definition of "interest" in property under § 363(f) encompasses the Lifetime Memberships, and because that interest is avoidable under 11 U.S.C. § 544(a) it is in "bona fide dispute," thereby satisfying § 363(f)(4); and (iii) despite the sale of the assets to a part-owner of Debtors, the sale nonetheless is in good faith and for a sound business purpose, as it is the result of considerable marketing.

The Motion raises the difficult question of how to characterize the Lifetime Memberships *vis-à-vis* the property being sold.  The documents create a contractual relationship between the parties - defining the responsibilities and obligations of each side.  The first step in the analysis is a determination of whether that contract is executory.  If so, Debtors may reject the Lifetime Memberships before transferring the Sale Assets.  Alternatively, regardless of the nature of the contract, Debtors may also be able to sell free and clear of those interests pursuant to § 363(f)(4).

The Court will address each of the points made and will grant the Motion for the reasons that follow.

## <u>Jurisdiction</u>

The Court has jurisdiction over this contested matter under 28 U.S.C. §§ 1334(a) and 157(a) and the Standing Order of the United States District Court dated July 23, 1984, as amended September 18, 2012, referring all bankruptcy cases to the bankruptcy court.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A), (N), and (O).  Venue is proper in this Court pursuant to 28 U.S.C. § 1408 and 1409.  Pursuant to Fed. R. Bankr. P. 7052, the Court issues the following findings of fact and conclusions of law.

**Facts**

The L.L.P. that preceded the Debtors was formed in 1997 to construct and operate a golf club. Atlantic Homes owned 91% of the L.L.P. Soon after its formation, the L.L.P. began advertising the Lifetime Memberships whereby the prospective members would pay a lump sum of $50,000 or $60,000 in exchange for the benefits of membership as a means to fund the construction and development of the project. The Lifetime Members were provided a "Q & A" brochure from an information session that occurred in 1997. They note that the brochure asks "[w]hat happens to our membership if Sea Oaks declares bankruptcy two years down the line?" The response to the questions focuses on the economic reasons that the project would not need to declare bankruptcy, while not addressing what would happen to the Lifetime Memberships in the event of a bankruptcy.[3]

The record indicates that approximately sixty Lifetime Memberships were sold during that time period, with an additional seven Lifetime Memberships sold at a later time period. The Lifetime Membership certificates at issue here were transferrable. They identified the "Management" as the L.L.P., "its officers, employees, agents, servants, successors, and assigns." In addition to outlining the membership rights and privileges regarding unlimited golf course play, complimentary use of golf carts, discounts on merchandise, and other amenities, the certificates contained the following provisions:

Duration of Membership

The rights and privileges hereby granted to the Member and his or her transferees shall be irrevocable and shall continue in perpetuity. Any sale or transfer of the golf course, club house and/or related facilities shall be made subject to the rights granted by this certificate of membership.

---

[3] The Lifetime Members acknowledge that the response to the question regarding bankruptcy does not prevent Debtors from filing bankruptcy. They use it to question the good faith of Debtors.

Rules and Regulations

Any person exercising the rights and privileges granted by this
membership certificate shall be subject to and shall abide by all general
rules and regulations promulgated by Management pertaining to such
matters as golf course and club house operations and rules of conduct
applicable to Members and guests.

The Golf Club and Country Club were formed in 2003.  Atlantic Homes held a 49%
ownership interest in each entity.  In January 2015, Atlantic Homes loaned Golf Club the principal
amount of $9,600,000.00, which is evidenced by a promissory note and secured by a recorded first
priority mortgage on the Real Property.  The obligations are guaranteed by Country Club.  Atlantic
has filed a proof of claim in the amount of $10,440,342.50.

Debtors each filed bankruptcy on June 3, 2020.  An order granting joint administration was
entered on July 1, 2020.  On July 27, 2020 Debtors filed a Motion for Approval of Bidding
Procedures, which was granted by order dated August 20, 2020.  That same date, Debtors filed the
Motion.  The Lifetime Members filed opposition and oral argument was held on September 9,
2020, at which point additional briefing was requested and provided.

**Legal Analysis**

I.    The Lifetime Memberships Are Executory Contracts and Can Be Rejected

The initial inquiry for this Court is whether the Lifetime Memberships are executory
contracts, which may be rejected pursuant to the plain language of § 365(a).[4]  If the Lifetime
Memberships can be rejected, Debtors obligations to the Lifetime Members are terminated, and
no further analysis is necessary as to how those obligations affect the Sale Assets.  But the fact
that the Lifetime Memberships are "irrevocable and shall continue in perpetuity" complicates the

---

[4] 11 U.S.C. § 365(a) provides that, with exceptions not applicable here, "the trustee, subject to the court's
approval, may assume or reject any executory contract or unexpired lease of the debtor."

analysis and compels this Court to agree with Judge Bernstein, recently retired from the bankruptcy bench of the Southern District of New York, that "the time expended searching for executoriness can be spent more fruitfully doing almost anything else." *See* In re Hawker Beechcraft, Inc., 486 B.R. 264, 276 (Bankr. S.D.N.Y. 2013), *citation omitted*. Nevertheless, the Court finds the Lifetime Memberships to be executory contracts.

While there is no definition of executory contract in the Code, the Third Circuit defines an executory contract as "a contract under which the obligation of both the bankrupt and the other party to the contract are so far underperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other." In re Exide Tech, 607 F.3d 957, 962 (3d Cir. 2010), *citing* In re Columbia Gas Systems, Inc., *supra*, 50 F.3d at 239); *see also* Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp., 872 F.2d 36, 39 (3d Cir. 1989). This is an adaptation of the definition set forth by Vern Countryman in an oft-cited law review article. *See* Vern Countryman, Executory Contracts in Bankruptcy, Part 1, 57 Minn. L. Rev. 439, 460 (1973). The Third Circuit explains that, "unless both parties have unperformed obligations that would constitute a material breach if not performed, a contract is not executory under section 365." *See* In re Exide Tech, *supra*, 607 F. 3d at 962. The time for determination of whether there are material unperformed obligations of both parties to a contract is as of the entry of the order for relief. *See* id.

The Court finds that both Debtors and the Lifetime Members had unperformed obligations as of the entry of the order for relief. The Debtors were obligated to maintain and provide access to the golf course and its amenities. According to their memberships, the Lifetime Members were "subject to and [promised to] abide by all rules and regulations" of the Debtors. While receiving discounts on certain items, Lifetime Members were still required to settle their accounts for any

purchases of merchandise or food, and for the use of certain services.  They could not deface club

property or abuse other members or staff.  They were obligated to comply with scheduled tee times

and rules of play.  There were clearly unperformed obligations owed by all of the parties to the

contract.  But for the Lifetime Memberships to be considered executory, the mutual obligations

must be material.

      To determine whether a breach is material, the Court must look to state law.  *See* General

Datacomm Indus. v. Arcara, (In re General Datacomm Indus.), 407 F.3d 616, 627 (3d Cir. 2005).

New Jersey law recognizes that a material breach of contract on the part of one party entitles the

other party to terminate it.  *See* Ross Systems v. Linden Dari-Delite, 35 N.J. 329 (1969); *see also*

Young Travelers Day Camps, Inc. v. Felsen, 118 N.J. Super. 304 (App. Div. 1972).  A breach is

material if it goes to the essence of the contract.  *See generally*, Ross Systems, *supra*, 35 N.J. at

341; *accord* 2 Restatement, Contracts (1932) § 399 at 274-276.  Whether a breach is material is a

question of fact.  *See* Magnet Resources, Inc. v. Summit MRI, Inc., 318 N.J. Super 275 (App. Div.

1998); *see also* Farnsworth on Contracts § 8.16 (1990).

      The Lifetime Members take the position that they have fully performed under the terms of

the contract by making the upfront, lump-sum payment, and cite to the language of the Lifetime

Membership certificates that define their rights and privileges as "irrevocable" and "continu[ing]

in perpetuity."  They cite to the New Jersey Supreme Court's opinion in Ross Systems noting that,

in addition to determining whether the breach goes to the essence of the contract, to be material,

the breach must also allow the non-breaching party to terminate the contract.

      This Court reads the Ross Systems opinion as meaning that a material breach is a breach

that would entitle the non-breaching party to terminate its obligations to perform.  The opinion

does not require that, for a breach to be material, it must give rise to the ability to terminate.

Quoting the <u>Ross Systems</u> Court, "[i]f the breach is material, i.e., goes to the essence of the contract, the non-breaching party <u>may treat the contract as terminated and refuse to render continued performance.</u>"  <u>Ross Systems</u>, 35 N.J. at 341 (emphasis added).

Certainly, the Lifetime Members' obligations to keep their accounts current, respect club personnel and property, and otherwise abide by the rules and regulations of the club, go to the essence of the contract.  Some recourse must be available to the Debtors to address a Lifetime Member who refuses to pay his accounts, defaces club property, assaults other members or staff, or refuses to respect tee-times or rules of play.  So, while Debtors may not be able to terminate the Lifetime Membership, they must have some redress for a material breach by a Lifetime Member.  The Debtors would be entitled to terminate their obligations to perform, to suspend the rights and privileges of a Lifetime Member who has refused to comply with the rules and regulations.  This is consistent with the opinions of the New Jersey Supreme Court regarding redress for a material breach.  The concept of rejection under § 365 allows Debtors to terminate their obligation to perform.  Rejection is treated as a breach of the contract and gives rise to a pre-petition claim for the Lifetime Members.  *See* 11 U.S.C. § 365(g)(1).

For these reasons, the Court finds that the unperformed mutual obligations are material under state law.  The Lifetime Memberships are executory contracts that may be rejected by the Debtors.  *See* 11 U.S.C § 365(a).

The ability to reject the Lifetime Memberships is not the only grounds on which the Court relies in granting the Motion.  Debtors also argue they can sell free and clear of liens pursuant to 11 U.S.C. § 363(f) and, for the reasons that follow, the Court agrees.

II.     The Motion May Be Granted Pursuant to 11 U.S.C. § 363(f)(4)

(i)     The Lifetime Memberships Constitute an "Interest" in Property Under § 363(f)

11 U.S.C. § 363(f) provides that a trustee may sell property of the estate in certain limited

circumstances "free and clear of <u>any interest</u> in such property of an entity other than the estate . .

." (emphasis added).   A bankruptcy court within the Third Circuit has observed:

> In construing section 363(f), the Third Circuit Court of Appeals has
> instructed that the term "interest" includes, but is broader than, liens on the
> property to be sold:
>
> > Some courts have narrowly interpreted interests in property to mean
> > in rem interests in property, such as liens. . . . However, the trend
> > seems to be toward a more expansive reading of "interests in
> > property" which "encompasses other obligations that may flow from
> > ownership of the property." 3 Collier on Bankruptcy ¶ 363.06[1].
>
> <u>In re Trans World Airlines, Inc.,</u> 322 F.3d at 288-89 (citations and footnote
> omitted) (airline workers' employment discrimination claims, as well as
> flight attendants' rights under travel voucher program, constituted an
> interest in the airline assets sold under section 363(f)); *see also* <u>Folger Adam
> Security, Inc. v. DeMatteis/MacGregor JV</u>, 209 F.3d 252, 264-65 (3d Cir.
> 2000) (setoff rights constitute an interest in property and can be divested by
> a sale under section 363(f)).

<u>In re Scimeca Foundation, Inc.</u>, 497 B.R. 753, 772-73 (Bankr. E.D. Pa. 2013).  The Third Circuit

found that the language of § 363(f) contemplated the broader reading, stating that:

> [W]e find ourselves in agreement with Collier's observation that:
>
> > Section 363(f) permits the bankruptcy court to authorize a sale free
> > of "any interest" that an entity has in property of the estate. Yet the
> > Code does not define the concept of "interest," of which the property
> > may be sold free. Certainly a lien is a type of "interest" of which the
> > property may be sold free and clear. This becomes apparent in
> > reviewing section 363(f)(3), which provides for particular treatment
> > when "such interest is a lien."  Obviously there must be situations in
> > which the interest is something other than a lien; otherwise section

363(f)(3) would not need to deal explicitly with the case in which
the interest is a lien.

> 3 Collier on Bankruptcy ¶ 363.06[1]. *See also* In re P.K.R. Convalescent
> Centers, Inc., 189 B.R. 90, 94 (Bankr.E.D.Va.1995) ("As the plain meaning
> of the statute demonstrates, § 363 covers more situations than just sales
> involving liens.") (citing In re Beker Indus. Corp., 63 B.R. 474, 478
> (Bankr.S.D.N.Y.1986) and In re Manning, 37 B.R. 755, 759
> (Bankr.D.Colo.1984), *aff'd in part*, *vacated in part*, 831 F.2d 205 (10th
> Cir.1987)); In re WBQ Partnership, 189 B.R. at 105 ("Since 'lien' is a
> defined term under the Bankruptcy Code, it stands to reason that Congress
> would have used the term 'lien' instead of 'interest,' had it intended to
> restrict the scope of § 363(f) to liens. Furthermore, § 363(f)(3) applies to
> situations in which 'such interest is a lien,' which suggests that liens
> constitute a subcategory of 'any interest.' ").

In re Trans World Airlines, Inc., 322 F.3d 283, 290 (3d Cir. 2003).  Ultimately, the Trans World

Airlines Court found that the interests in the bankruptcy estate property "are not interests in the

property in the sense that they are not in rem interests, . . . they are interests in property within the

meaning of § 363(f) in the sense that they arise from the property being sold."  Id.

Debtors rely on this expansive view of the term "interest in such property" in support of

their position that the Lifetime Memberships fall under the purview of § 363(f).  They look to the

plain language of the Lifetime Membership certificates, which states that "[a]ny sale or transfer of

the golf course, club house and/or related facilities shall be made subject to the rights granted by

this certificate of membership."  Because the agreement explicitly states that the Lifetime

Members have "rights" to which the Sale Assets are "subject," those rights must therefore create

an "interest" in the property.

The Lifetime Members agree that the Lifetime Memberships are interests in the property,

just not the kind of "interest" that can be affected in a § 363 sale.  They rely primarily on a case

where the Nebraska Supreme Court held that the sale of a golf course under § 363 through a

bankruptcy proceeding did not affect the implied restrictive covenants of adjacent landowners

which limited the property's use to that of a golf course.  Skyline Woods Homeowners Ass'n v.

Broekemeier, 276 Neb. 792 (2008).  The Nebraska Supreme Court ruled:

> "Any interest" is not defined by the bankruptcy code. However, case law
> demonstrates that the bankruptcy order authorizing the sale to Liberty did
> not extinguish the implied restrictive covenants limiting the property to the
> use as a golf course, because such interests are not within the meaning of
> "any interest" under § 363(f). The courts addressing whether a bankruptcy
> trustee may sell property of an estate free and clear of restrictive covenants
> under § 363(f) have all concluded that such a sale is not permitted.

Id. at 814.  The Skyline Woods case presents facts that are inapposite to the facts here and is

unpersuasive.

Skyline Woods Golf Course had been sold pursuant to an order issued by the U.S.

Bankruptcy Court for the District of Nevada (the "363 Sale Order") in a chapter 11 case filed in

2004.  After the purchasers decided not to reopen the golf course and began changing the nature

and use of the property, nearby residents and various homeowner associations (collectively, the

"State Court Plaintiffs") sued the purchaser in state court, asserting express and implied restrictive

covenants requiring that the property be maintained as a golf course. See Mid-City Bank v. Skyline

Woods Homeowners Ass'n (In re Skyline Woods Country Club), 636 F.3d 467, 469 (8th Cir.

2011).  The purchaser responded by filing a motion in the bankruptcy court to enforce terms of the

363 Sale Order, which allegedly barred the State Court Plaintiffs from pursuing their state-law

claims.  See id.  But the purchaser withdrew its motion when the bankruptcy court required the

purchaser to move to reopen and pay a filing fee.  See id.  Instead, the purchaser chose to defend

the state court suit on its merits, arguing that the State Court Plaintiffs' claims were precluded by

the 363 Sale Order.  See id.  Ultimately, the state court entered a judgment finding that the 363

Sale Order did not eliminate restrictive covenants that ran with the land requiring the operation of

a golf course.  See id.

As a result of the state court decision, the purchaser defaulted on its loan to Mid-City Bank (the "Bank") and the Bank returned to the bankruptcy court seeking relief.  *See* id.  The bankruptcy court refused to consider the Bank's request finding that the issue had already been decided by the Nebraska Supreme Court.  *See* id. at 469-70, *citing* Mid-City Bank v. Skyline Woods Homeowners Assoc. (In re Skyline Woods Country Club, LLC), 431 B.R. 830, 835 (B.A.P. 8th Cir, 2010).

In Skyline Woods Homeowners Ass'n, the Nebraska Supreme Court determined the existence of an implied covenant that ran with the land.  It noted that the implied covenants were not recorded, but that the purchasers had actual knowledge of their existence so could not have taken title free and clear of the implied covenants as "a subsequent purchaser without notice."[5] *See* Skyline Woods Homeowners Ass'n v. Broekemeier, 276 Neb. 792, 812-13 (2008).  It relied on cases decided by bankruptcy courts that similarly did not allow sales free and clear of such interests.  Those cases are instructive but, as discussed below, not in a way that supports the Lifetime Members' position that the interests created by the Lifetime Memberships cannot be affected in a § 363 sale.

In Gouveia v. Tazbir, the court refused to allow a sale of property free and clear of a reciprocal land covenant, but the covenant was recorded.  *See* Gouveia v. Tazbir, 37 F.3d 295, 298 (7th Cir. 1994).  It noted that a "restrictive covenant recorded on a plat is a covenant running with the land, and that it creates a "property right" in each grantee and any subsequent grantees of the plat subject to the restriction."  *See* id., *citing* Pulos v. James, 261 Ind. 279, 302 N.E.2d 768, 771 (Ind. 1973) (emphasis added).  Similarly, the court in In re Oyster Bay Cove, Ltd., noted the 363 sale was "subject to such facts as an accurate survey may show, including any covenants, restrictions and easements of record."  *See* 161 B.R. 338, 340 (Bankr. E.D.N.Y. 1993).  The Oyster

---

[5] This conclusion ignores the impact of the strong-arm powers that are an essential part of the Code.  *See* 11 U.S.C § 544.

<u>Bay</u> Court did not otherwise discuss the definition of "interest" in connection with a sale made pursuant to 363. The <u>In re WBQ Partnership</u> Court actually found that the term 'interest' extends beyond liens. *See* 189 B.R. 97, 105 (E.D. Va. 1995). That court held that the buyer in a 363 sale could not be pursued by the state taxing authority to recover depreciation overpayments made to the debtor. *See* <u>id</u>. Finally, in <u>In re 523 E. Fifth St. Housing Pres. Dev. Fund</u>, the court held that a restriction contained in recorded deed requiring use of property for low income housing could not be eliminated through sale per state law. *See* <u>In re 523 E. Fifth St. Housing Pres. Dev. Fund</u>, 79 B.R. 568 (S.D.N.Y. 1987). That court did not address the definition of "interest" under 363(f). These decisions appear to support, rather than rebut, this Court's ultimate conclusion.

The Lifetime Memberships fall squarely within the definition of "any interest" as interpreted by the Third Circuit. The interest arises from the property being sold. This is contractually recognized by the Lifetime Memberships, which explicitly state as much when they provide that a sale is subject to the rights of the Lifetime Members. It would be illogical to accept the Lifetime Members argument that, on one hand, the Lifetime Memberships are mere contracts that do not create an interest in the Sale Assets and, on the other, that they have an irrevocable right continuing into perpetuity as to those same Sale Assets.

The real question is whether the Golf Club Assets can be sold free and clear of that interest. This Court finds that they can, and that the Lifetime Members reliance on cases that address restrictive covenants supports, rather than challenges that conclusion.

(ii)    The Lifetime Memberships are in Bona Fide Dispute

The mere existence of an interest in property does not alone give a trustee or debtor the absolute right to sell that property free and clear of the interest. The Bankruptcy Code only allows for such a sale if:

(1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;
(2) such entity consents;
(3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
(4) such interest is in bona fide dispute; or
(5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f). The section is written in the disjunctive, a trustee need only satisfy one of the factors to allow for a sale. In re Messina, 687 F.3d 74, 77 n. 4 (3d Cir.2012). Here, the Debtors sole contention is that the Lifetime Memberships are in bona fide dispute, satisfying § 363(f)(4).

The Third Circuit has defined a "bona fide dispute" as "a genuine issue of a material fact that bears upon the debtor's liability, or a meritorious contention as to the application of law to undisputed facts...." B.D.W. Associates, Inc. v. Busy Beaver Bldg. Centers, Inc., 865 F.2d 65, 66– 67 (3d Cir.1989). While that definition was provided in the context of 11 U.S.C. § 303(h)(1), a similar definition is applied to § 363(f)(4). See In re Scimeca Foundation, Inc., 497 B.R. at 773. The goal of § 363(f)(4) is to promote "the sale of property subject to dispute 'so that liquidation of the estate's assets need not be delayed while such disputes are being litigated.'" In re Bella Vista Associates, LLC, 2007 WL 4555891, *4 (Bankr. D.N.J. Dec. 18, 2007). The burden of proof to establish the existence of a bona fide dispute rests upon the trustee. Id.

Here Debtors do not, and cannot, reasonably dispute the existence or validity of the interest created by the Lifetime Membership. Instead, they cite to caselaw in support of the proposition

that the interests are avoidable via the trustee's strong-arm powers under 11 U.S.C. § 544(a), which creates a bona fide dispute that satisfies § 363(f)(4).  *See*, In re Millerburg, 61 B.R. 125, 128 (Bankr. E.D.N.C. 1986) (potential preference action qualifies as a bona fide dispute for purposes of § 363(f)(4)); Union Planters Bank, N.A. v. Burns (In re Gaylord Grain L.L.C.), 306 B.R. 624, 627 (B.A.P. 8th Cir. 2004) (if trustee shows objective basis for avoiding liens under § 544 thereby establishing bona fide dispute, he can sell free and clear of liens pursuant to § 363(f)(4) even without filing avoidance complaint); In re Bedford Square Assocs., L.P., 247 B.R. 140, 145 (Bankr. E.D. Pa. 2000) (same).  The Lifetime Members have made no argument to the contrary.

Section 544(a)(3) of the Code provides that a trustee may avoid any obligation incurred by the debtor that is voidable by "a bona fide purchaser of real property, other than fixtures, from the debtor, against whom applicable law permits such transfer to be perfected, that obtains the status of a bona fide purchaser and has perfected such transfer at the time of the commencement of the case, whether or not such a purchaser exists." *See* 11 U.S.C. §544(a)(3).  State law governs the scope of a trustee's avoidance powers. *See* In re Bridge, 18 F.3d 195, 200 (3d Cir.1994).

New Jersey law provides that documents affecting real property may be recorded, thereby giving notice to subsequent purchasers of the interest in such property. *See* N.J. Stat Ann. § 46:26A-2 and § 46:26A -12.  According to statute, documents affecting real property include restrictions affecting its use and:

> any other document that affects title to any interest in real property in any way or contains any agreement in relation to real property, or grants any right or interest in real property or grants any lien on real property.

*See* id. at (k) and (p).  The Lifetime Memberships clearly are recordable documents.

These recording statutes codify the long-standing idea that New Jersey is a "race notice" jurisdiction, as articulated by the New Jersey Supreme Court:

> New Jersey is considered a "race-notice" jurisdiction, which means that as between two competing parties the interest of the party who first records the instrument will prevail so long as that party had no actual knowledge of the other party's previously-acquired interest. <u>Palamarg Realty Co. v. Rehac</u>, 80 N.J. 446, 454, 404 A.2d 21 (1979). As a corollary to that rule, parties are generally charged with constructive notice of instruments that are properly recorded. <u>Friendship Manor, Inc. v. Greiman</u>, 244 N.J. Super. 104, 108, 581 A.2d 893 (App.Div.1990) ("In the context of the race notice statute, constructive notice arises from the obligation of a claimant of a property interest to make reasonable and diligent inquiry as to existing claims or rights in and to real estate."), *certif. denied*, 126 N.J. 321, 598 A.2d 881 (1991).

<u>Cox v. RKA Corp.</u>, 164 N.J. 487, 496 (2000).   The Debtors' position is based upon the straightforward idea that because the Lifetime Memberships restricted and/or otherwise affected the Sale Assets, and because that interest was not recorded, it is of no effect as to a bona fide purchaser, and § 544(a) applies.  Section 544 cloaks the Debtors with the mantle of a hypothetical bona fide purchaser for avoidance purposes.  The Lifetime Memberships may be avoided by a hypothetical bona fide purchaser, because a hypothetical bona fide purchaser would have no knowledge of the unrecorded interest affecting the property.

The Lifetime Members note that the caselaw relied upon by the Debtors relates primarily to unrecorded deeds and mortgages, and that the Lifetime Memberships at issue are an entirely different type of interest.  They claim there is no requirement that the Lifetime Memberships be recorded.  But the fact that there is no requirement that the Lifetime Memberships be recorded is irrelevant.  There is no requirement that deeds or mortgages be recorded either.  The recording of the document preserves its place in relation to property as against all future purchasers.  The relevant fact is that the Lifetime Memberships could have been recorded but were not.

The Lifetime Members again refer to caselaw where courts have found the existence of a restrictive covenant even where the covenant was implied and not in the recorded deed.  In the

first such case, a court found that there was an implied restrictive covenant as to a golf course

constructed as a part of a residential development that could not be avoided in a bankruptcy sale.

*See* Heatherwood Holdings, LLC v. HGC, Inc. (In re Heatherwood Holdings, LLC), 746 F.3d 1206

(11th Cir. 2014).  The Heatherwood Holdings Court, with the assistance of the answers to three

questions certified to the state court, found that the "initial development and marketing of the

Heatherwood subdivision, as well as the sign, street names, easements, plat maps and actual use

created an implied restrictive covenant restricting the use of the golf course property to use as a

golf course." Id. at 1215.  Similarly, the Nebraska Supreme Court found that an implied restrictive

covenant could not be voided by a bankruptcy sale.  *See* Skyline Woods Homeowners Ass'n,

*supra*, 276 Neb. 792.  But that court specifically defined an implied restrictive covenant as:

> [A] covenant which equity raises and fastens upon the title of a lot or lots
> carved out of a tract that will prevent their use in a manner detrimental to
> the enjoyment and value of neighboring lots sold with express restrictions
> in their conveyance."  In order for implied restrictive covenants to exist,
> there must be a common grantor of land who has a common plan of
> development for the land.

Id. at 805.

Here, the Lifetime Members are not grantees of land that is part of a common plan of

development.  They did not purchase land through which a restrictive covenant may be implied.

They purchased memberships that allowed them to use the golf course in accordance with its rules

and regulations.  They have an interest in the Sale Assets based solely on their membership

contract, not on their ownership of real property in a common development.

The Debtors further note that, unlike the cases cited by the Lifetime Members, Debtors'

property had no common development plan.  There are no signs, street names, easements, or

anything else which would provide any notice that the Lifetime memberships existed as a

restriction on the Sale Assets.  Further, these cases do not address § 544.

The Lifetime Members correctly point out that parties who have constructive notice of such a restriction cannot be considered bona fide purchasers for value.[6]  The relevant question for this Court is whether a bona fide purchaser of the Sale Assets would be charged with constructive notice of the Lifetime Memberships under New Jersey law.  Other than comparing the Lifetime Memberships to implied restrictive covenants with regard to common land development, which Debtors have distinguished and the Court agrees, the parties did not address the question.  This Court was not able to find the answer in any New Jersey statue or caselaw.  Ultimately, this Court need not make a definitive determination.  Whether constructive notice of the Lifetime Memberships would be implied under New Jersey law is an issue of fact upon which Debtors and the Lifetime Members apparently disagree.  What is clear for our purposes is that there is a bona fide dispute between Debtors and the Lifetime Members about whether the estate can avoid the unrecorded Lifetime Memberships. The dispute does not have to be resolved before the estate may be authorized to sell the property free and clear under § 363(f)(4).

The findings that the Lifetime Memberships are "interests" under § 363(f) and that they are the subject of a bona fide dispute that satisfies § 363(f)(4), do not end this Court's inquiry. Sales in bankruptcy must be made in good faith.

(iii)    <u>The Sale was Made in Good Faith</u>

11 U.S.C. § 363(b)(1) provides that the trustee "may use, sell, or lease, other than in the ordinary course of business, property of the estate."   Because bankruptcy sales pursuant to §

---

[6] Debtors note that the current ownership interests in Atlantic Homes are not the same as they were in 1997 when Atlantic Homes owned 91% of the L.L.P. that preceded Debtors and sold the Lifetime Memberships.  Consequently, they argue, the new owners cannot be charged with constructive knowledge.  The Court rejects this argument. The corporate entity that is Atlantic Homes does not change with a change in its ownership.  Corporate knowledge acquired under the old owners is imputed to the current owners.

363(b) are conducted outside of the normal Chapter 11 plan process, they must be evaluated under the business judgment standard. It is the debtor's burden to establish the sound business reasons for the terms of the proposed sale. In re Congoleum, Corp., 2007 WL 1428477, *2 (Bankr. D.N.J. May 11, 2007). Courts generally consider four factors in considering whether sound business judgment exists: (1) whether there is a sound business reason for the sale; (2) whether the sale is proposed in good faith; (3) whether adequate and reasonable notice has been afforded, and (4) whether a fair and reasonable purchase price is offered. Id.

As to the first factor, Debtors have articulated ample business purpose for this sale. They note that there is a lack of operating capital, an absence of an influx of capital, and that they were operating at a loss even pre-COVID. There are no other good options for these Debtors except for a sale. The open, reasonably noticed sale and auction process is the best way to maximize value versus an alternative such as a foreclosure sale. For the same reasons, the Court finds the sale was proposed in good faith.

Good faith is also required of the purchaser. See In re Abbotts Dairies of Pa., Inc., 788 F.2d 143, 150 (3d Cir. 1986). The Court cannot find good faith if fraud, collusion or unfair advantages are determined to exist. Id. at 147. "The requirement that a purchaser act in good faith . . . speaks to the integrity of his conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." Id.

The good faith analysis provided by the Abbotts Dairies Court also informs the third and fourth factors noted in In re Congoleum: whether adequate and reasonable notice has been afforded, and whether a fair and reasonable purchase price is offered. It notes that an auction may

be sufficient to establish that one has paid "value" for the assets of a bankrupt." Id. at 149.  Clearly, an auction, if conducted properly, would also provide adequate and reasonable notice.

Debtors outlined their marketing procedures, which included reaching out to local governments, to the local HOA, and to brokers to gauge the market for the Sale Assets.  They launched a website devoted to the sale with a targeted Google ad campaign.  Debtors identified and vetted over twenty potential buyers, who were made aware of the sale and auction bid procedures.  To ensure that Debtors received the maximum value for the Sale Assets and that the purchase price the estates realized was fair and reasonable, the sale of the Sale Assets to Atlantic Homes was expressly subject to higher and better offers from third parties, and the ultimate sale price was to be determined by auction if competing offers were received.  Yet, no higher bids were received.  Debtors have fully disclosed and requested the Court's approval of the sale and have provided comprehensive notice of the sale.

Here, the purchaser, Atlantic Homes, also owns 49% of Debtors and is their largest creditor.  As permitted by the Code, it offers to buy the Sale Assets mainly through a credit bid.  It proposes to pay $200,000.00 for the liquor license portion of the Sale Assets.  Although the credit bid of $3,000,000.00 is far less than its secured claim of $10,000,000.00, the Court notes that a higher bid would not have made a difference in any distribution to creditors unless the bid was significantly higher than the bid offered by Atlantic Homes.  As noted, there were no higher bids.  No one has challenged the sufficiency of the cash portion of the payment for the liquor license.

The Lifetime Members are not likely to receive any distribution on their unsecured claims.  They argue that the only beneficiary of the sale is Atlantic Homes, a 49% equity owner of Debtors.  Debtors should not be allowed the windfall of avoiding the Lifetime Memberships while continuing with "business as usual."

Whether a particular action provides a windfall for the debtor or a benefit for the estate "depends on a case-by-case, fact-specific analysis." *See* Dunes Hotel Assocs. v. Hyatt Corp., 245 B.R. 492, 509 (D.S.C. 2000), *citing* Wellman v. Wellman, 933 F.2d 215, 218 (4th Cir. 1991). Courts employing their equitable powers to deny avoidance have done so in circumstances much different than those presented to this Court. *See, e.g.*, Wellman, 933 F.2d at (individual debtor not allowed to avoid his own pre-petition stock sale on grounds he did not receive reasonably equivalent value because avoidance pursued solely for debtor's own benefit), *emphasis added*; Dunes Hotel Assocs., 245 B.R. at 509 (solvent debtor-in-possession not allowed to avoid unrecorded leasehold interest where debtor, equity holder and trustee are were only beneficiaries), *emphasis added*.

The problem with the argument advanced by the Lifetime Members is that Atlantic Homes is not the Debtors. Atlantic Homes is a separate entity. Debtors are selling all of their assets, essentially liquidating. The Court recognizes that Atlantic Homes is likely the only entity to benefit from the sale. This does not change the fact that Debtors are insolvent and will remain insolvent. Debtors themselves receive no benefit. In fact, to the extent Atlantic Homes actually benefits from the sale, it is apparent that the return on its investment amounts to a significant loss.

The relationship of the buyer to Debtors, by itself, does not mean that the sale is not one made in good faith. It does not demonstrate collusion or unfair advantage. There is no evidence of collusion or any indication that Atlantic Homes and Debtors have manipulated the open marketing and bidding process to their advantage. There is similarly no evidence as to how the bidding procedures created any unfair advantage as to Atlantic Homes. For these reasons, the Court is comfortable in making a finding that the sale is in good faith.

**<u>Conclusion</u>**

      For these reasons, the Court will approve the Motion.


                            <u>/s/Christine M. Gravelle</u>
Dated: <u>November 10, 2020</u>          United States Bankruptcy Judge